**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 29, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

STEVEN E. SPRADLEY,

    Defendant - Appellant.

No. 23-3222

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 5:21-CR-40088-TC-1)**

_____

Paige A. Nichols, Assistant Federal Public Defender (Melody Brannon, Federal Public Defender, with her on the briefs), Office of the Federal Public Defender, Topeka, Kansas, for Defendant-Appellant.

James A. Brown, Appellate Chief (Kate E. Brubacher, United States Attorney, with him on the brief), Office of the United States Attorney, District of Kansas, Topeka, Kansas, for Plaintiff-Appellee.

_____

Before **BACHARACH**, **MURPHY**, and **EID**, Circuit Judges.

_____

**BACHARACH**, Circuit Judge.

_____

    In this appeal, we must decide whether the trial evidence could have supported a defense of entrapment. This issue arose when the defendant,

Mr. Steven Spradley, drove to another state to meet a deputy sheriff pretending to be a 17-year-old girl. After Mr. Spradley made the drive, he was charged with crossing the state line to pay for sex with a minor. 18 U.S.C. § 2423(b).

Mr. Spradley asserted a defense of entrapment; but the district court refused to instruct on this defense based on insufficiency of the evidence, and Mr. Spradley was convicted. In light of this conviction, we must decide whether a reasonable jury could have found entrapment based on the trial evidence. *Mathews v. United States*, 485 U.S. 58, 63 (1988). We answer *yes*.

1.    **Mr. Spradley is the target of a sting operation.**

When the incident took place, Mr. Spradley was 56 years old and living in Kansas City, Missouri. He expressed loneliness, testifying that he used the internet to "meet somebody." R. vol. 3, at 387. Through the internet, Mr. Spradley spotted an advertisement posted by a deputy sheriff impersonating a young woman: "Needing to make some money. Recently graduated and looking to make money for a new ride to attend cosmetology school." Supp. R. vol. 1, at 4.

Mr. Spradley responded: "I'll give you $500 to spend the weekend trading orgasms with me … :)" *Id.* at 5. The deputy sheriff, still impersonating the young woman, said that she was 17 and asked if her age would pose a problem. Mr. Spradley didn't answer directly, but he

2

continued emailing and texting the fictitious girl. In these messages, Mr. Spradley said that he wanted a relationship with the girl, offering to take her around Kansas City, showing her photographs of a motorcycle and a pet bird, and asking if they could talk on the phone.

As the two arranged to meet, the fictitious girl indicated that Mr. Spradley would need to make the drive to Kansas, explaining that her car wouldn't make it to Missouri. Mr. Spradley agreed and said that he would bring $500 and whiskey. He made the drive but didn't have the $500 or the whiskey when he arrived.

## 2.     The district court erred in failing to instruct on entrapment.

We conclude that Mr. Spradley was entitled to an instruction on entrapment.

### a.     Standard of Review

In determining whether the evidence could have supported a finding of entrapment, we conduct de novo review and resolve all reasonable inferences from the evidence in the light most favorable to Mr. Spradley. *United States v. Stein*, 985 F.3d 1254, 1264 (10th Cir. 2021). In that review, we consider the defense of entrapment, which is "fact-intensive," often "mak[ing] jury consideration of demeanor and credibility evidence a pivotal factor." *United States v. Brown*, 43 F.3d 618, 625 (11th Cir. 1995).

This fact-intensive defense contains two elements:

1.    The defendant lacked a predisposition to commit the offense.

2.    A governmental agent induced commission of the offense.

*United States v. Fadel*, 844 F.2d 1425, 1429 (10th Cir. 1988). We evaluate *predisposition* and *inducement* based on the underlying offense, which involves travel in interstate commerce with a motivating purpose to pay for sex with someone below the age of 18. 18 U.S.C. § 2423(b) (2021);[1] *see* p. 2, above. An instruction on entrapment is required if there is at least some evidence that (1) the defendant lacked predisposition and (2) a government agent induced commission of the offense. *See United States v. Mayfield*, 771 F.3d 417, 420 (7th Cir. 2014) (en banc) ("The defendant is entitled to an entrapment jury instruction if he can show that some evidence supports both elements of the defense.").

**b.    Predisposition**

*Predisposition* means a defendant's willingness to "engage in the illegal activity for which he has been charged . . . ." *United States v. Ortiz*, 804 F.2d 1161, 1165 (10th Cir. 1986). The jury can infer predisposition

---

[1]    When Mr. Spradley was indicted, the body of § 2423(b) used the term *a motivating purpose* rather than *intent*. 18 U.S.C. § 2423(b) (2021). The government equated the two terms, stating that "courts have concluded that the statute [18 U.S.C. § 2423(b)] requires that a person cross state lines with the specific intent to engage in an illicit sexual act." Appellee's Resp. Br. at 15. After Mr. Spradley appealed, Congress changed the term *a motivating purpose* to *intent*. National Defense Authorization Act for Fiscal Year 2024, Pub. L. No. 118-31, § 5102, 137 Stat. 136, 934.

4

either from the defendant's previous conduct or readiness to accept a governmental agent's illicit offer. *Id.* at 1165–66. As a result, "[p]redisposition rarely will be susceptible to resolution as a matter of law." *Mayfield*, 771 F.3d at 441.

Mr. Spradley argues that he lacked the predisposition either (1) to pay for sex or (2) to have sex with someone 17 years old or younger. For this argument, Mr. Spradley needed to show a factual dispute concerning the origin of his criminal purpose. *Id.* at 440. If he made that showing, the government would have needed to demonstrate predisposition beyond a reasonable doubt. *Id.*

### i. Paying for sex

In considering whether Mr. Spradley was predisposed to pay for sex, the jury could rely on his trial testimony, messages, and lack of money when he drove to meet the girl.

Mr. Spradley testified that he

- had never paid for sex and

- had not intended to pay the fictitious girl for sex.[2]

---

[2] At trial, the government asked Mr. Spradley if he had previously offered money for sex. But Mr. Spradley didn't testify that he had ever paid for sex.

Mr. Spradley did acknowledge that he had offered money to women; but he characterized these offers as efforts to obtain female companionship rather than sex. We must view that testimony in the light most favorable to Mr. Spradley. *See* Part 2(a), above.

To counter that testimony, the government points to Mr. Spradley's response to the advertisement, where he stated that he would pay $500 for sex. But Mr. Spradley testified that he had offered the money because a coworker had suggested a response so outrageous that the other person would either decline to respond or "come back on the affirmative" if her message had been fake. R. vol. 3, at 391.

The government also points out that Mr. Spradley and the fictitious girl continued to text about the $500. But these texts virtually always included internet slang for joking: *lol*, *Lawlz*, or 😊 *just playing*. This slang might have been meaningless, but it might also have indicated that Mr. Spradley regarded the continued talk about the $500 as a running joke.

In addition, the government notes that Mr. Spradley said that he would bring $500 when they met. But when he traveled to meet the fictitious girl, he didn't have the money.

Given the trial testimony, the messages, and the facts surrounding the trip, the jury could reasonably find that Mr. Spradley had lacked a predisposition to pay for sex. Of course, the jury might also have distrusted Mr. Spradley's trial testimony, downplaying his use of internet slang for jokes and concluding that he would have retrieved the $500 after meeting the girl. Viewing the evidence and reasonable inferences favorably to Mr. Spradley, however, a jury could reasonably have found no predisposition to pay for sex.

6

### ii.   Engaging in sex with someone younger than 18

Even if Mr. Spradley had been predisposed to pay for sex, he could still satisfy this element of the defense if he lacked a predisposition to engage in sex with someone who was younger than 18.

In our view, a jury could reasonably find that Mr. Spradley wasn't predisposed to have sex with someone younger than 18. For this finding, the jury could reasonably rely on Mr. Spradley's trial testimony and his messages with the fictitious girl.

Mr. Spradley testified that when the girl said she was only 17, he immediately regarded the ad as a fake:

Q.   Did you believe she was 17?

A.   No.

Q.   Why did you not believe that she was accepting your offer?

A.   On the face of the ad, when I saw that ad, it's been my experience that it's posted in the wrong place. It had a -- and I don't even know how to describe it, but I knew it was fake. And when I responded to it and they replied with -- almost immediately -- with an affirmative "sure, yeah," it told me everything that I needed to know that the ad was fake.

R. vol. 3, at 374. Mr. Spradley was then asked why he continued messaging. *Id.* He responded that he had continued messaging to find out who the person was and why the person was lying:

Q.   Okay. You're saying that the ad was fake. Question arises: Why did you persist?

7

A.    Part of my OCT, and it's actually a strength in the IT field, is an obsession to follow through, to see things through the end. If you're troubleshooting a PC, find out why the problem occurred. If -- if you think you're being lied to or taken advantage of, find out who it is; find out why. Why are they lying to you?

*Id.* Mr. Spradley added that he not only used the messages to identify the person and the reason for the lies, but also

- tried to trace the person's IP address,

- insisted on a telephone call in order to find clues about the person's reasons for lying, and

- learned that the metadata on the girl's photo had been altered.

The jury could have credited Mr. Spradley's testimony based on the messages themselves. In these messages, Mr. Spradley asked again and again for a chance to talk on the telephone. The fictitious girl disregarded several of these requests, which could have fostered Mr. Spradley's skepticism about what the person had been saying.

Mr. Spradley also asked for a photo and received it minutes after the fictitious girl had said that she was seventeen:



Supp. R. vol. 1, at 13. The photo was actually a female officer in her 30s. From the photo, Mr. Spradley could reasonably infer that he had been right to doubt the person's truthfulness when she said she was 17 years old.

Granted, the jury might have disbelieved Mr. Spradley's testimony. But a reasonable jury could have credited Mr. Spradley's testimony and supporting evidence to find that he lacked a predisposition to have sex with someone younger than 18.

### c.    Inducement

Entrapment also requires *inducement*, which is governmental conduct creating "a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense." *United States v. Ortiz*, 804 F.2d 1161, 1165 (10th Cir. 1986). *Inducement* can consist of persuasion or false promises of companionship. *Id.*

In our view, a reasonable jury could find that the deputy sheriff had recognized Mr. Spradley's loneliness and exploited it, enticing him to drive to Kansas in order to fulfill his fantasy of a romantic relationship. For example, the jury could infer deception to exploit Mr. Spradley's loneliness. *See United States v. Shinderman*, 515 F.3d 5, 15 (1st Cir. 2008) (stating that inducement can consist of deception designed to prey on a defendant's weakness); *United States v. Plowman*, 700 F.3d 1052, 1059 (7th Cir. 2012) ("We recognize that inducement can occur when a government agent preys on a defendant's emotional weaknesses."); *see also*

9

*United States v. Theagene*, 565 F.3d 911, 922 (5th Cir. 2009) (recognizing that "courts have identified inducement when government agents . . . take 'actions designed specifically to take advantage of the defendant's weaknesses'" (quoting *United States v. Gutierrez*, 343 F.3d 415, 420 (5th Cir. 2003))); *United States v. Poehlman*, 217 F.3d 692, 698–99 (9th Cir. 2000) (concluding that the jury could find inducement based on the government agents' use of friendship, sympathy, and psychological pressure over a defendant seeking a long-term relationship).

A reasonable jury could have regarded Mr. Spradley as lonely based on his testimony and his messages. For example, he testified that he had been lonely and messaged the fictitious girl, saying that

- "[b]eing single sucks" and

- he missed "having someone to do things with."

Supp. R. vol. 1, at 15, 20. Given the testimony and the messages, the jury could reasonably find that Mr. Spradley had acted out of loneliness. *See United States v. Poehlman*, 217 F.3d 692, 695, 702 (9th Cir. 2000) (concluding that a jury could find inducement based on the government's exploitation of a "lonely and depressed" person's "obvious need for an adult relationship").

The jury could also reasonably find that the deputy sheriff had exploited Mr. Spradley by appealing to his desire for a romantic relationship. For this finding, the jury could point to the deputy sheriff's

10

messages, which disclosed intimate details about the fictitious girl's life, suggesting her receptiveness to Mr. Spradley's expressions of loneliness and desire for a girlfriend. For example, the fictitious girl

- shared that she had been raised by a single mother,

- discussed food and movies,

- discussed marijuana preferences,

- disclosed her middle name and asked Mr. Spradley what his middle name was,

- shared her birthday month, and

- asked Mr. Spradley about his pet bird.

Mr. Spradley answered these questions and sometimes elaborated, suggesting that the fictitious girl's effort to build rapport had worked.

A reasonable jury could also find that the deputy sheriff had downplayed the harm of interaction by

- telling Mr. Spradley that the girl was nearly 18 and

- implying that she had sexual experience and would enjoy a sexual encounter.

*See United States v. Pérez-Rodríguez*, 13 F.4th 1, 20 (1st Cir. 2021) ("[R]epeated suggestions 'downplay[ing] the harm' caused by child sexual abuse, or otherwise justifying it, can constitute a 'plus factor' which a jury may rely on to find improper inducement.").

First, the deputy sheriff said that the girl was 17 years old and gave a birth date in August, meaning that she would turn 18 in just two months. Though the girl wasn't 18, she was above the age of legal consent for sex where she lived. *See* Kan. Stat. Ann. § 21-5507. So non-commercial consensual sex with the girl would have been legal.

Second, the fictitious girl sent messages suggesting sexual experience, such as "standard rules" for sex. Supp. R. vol. 1, at 25. And when Mr. Spradley offered to spend the weekend "trading orgasms," the fictitious girl asked "[w]hen can we do this," implying familiarity with sex. *Id.* at 5.

After offering a relationship and suggesting that the girl was sexually experienced, the deputy sheriff needed Mr. Spradley to drive across the Kansas border in order to convict him of a federal crime.[3] So the fictitious girl asked Mr. Spradley to visit her in Kansas.[4]

---

[3]    Even if Mr. Spradley had not crossed a state line, he might have been guilty of other crimes under state law. *See, e.g.*, Kan. Stat. Ann. § 21-6421(b)(1) ("Buying sexual relations"); Kan. Stat. Ann. § 21-6422(a)(1) (commercial sexual exploitation of a child). But Mr. Spradley was not charged with those crimes.

[4]    The government argues that Mr. Spradley initiated the offer to make the drive, pointing to his message: "You want me to come over there? I live in Kansas City. Don't you live in Topeka?" Supp. R. vol. 1, at 17. But Mr. Spradley was just responding to the fictitious girl's request for him to "swing by." *Id.*

But before Mr. Spradley would make the drive, he wanted to talk to whoever was messaging him. So Mr. Spradley asked the person to talk on the phone; however, the fictitious girl declined. Mr. Spradley asked again; she again declined. This process repeated itself until the deputy sheriff determined that Mr. Spradley would likely need to hear "a female voice" before making the drive. R. vol. 3, at 238, 313. Only then did a female officer call, pretending to be the girl messaging with Mr. Spradley. After this call, Mr. Spradley made the drive from Missouri to Kansas.

The jury could reasonably find inducement, attributing Mr. Spradley's acquiescence to the deputy sheriff's exploitation of a lonely man searching for companionship and intimacy.

**3.    We shouldn't affirm based on the dissent's theory that Mr. Spradley could have "backed out."**

The dissent contends that the jury couldn't have found entrapment because Mr. Spradley had a chance to "back out" when the fictitious girl asked if her age posed a problem. This contention is new.

Unlike the dissent, the government hasn't

- characterized the fictitious girl's disclosure of her age as an opportunity for Mr. Spradley to "back out" or

- argued that the chance to "back out" would have foreclosed a finding of entrapment.

The dissent resists characterization of its position as "new," calling it an "application of governing law" on the issue of inducement. Dissent at

13

10. But this position is new regardless of the dissent's characterization as an application of law to the broader issue of inducement. After all, the government doesn't refer to a chance to "back out" or argue that this chance would alone prevent an instruction on entrapment.

The dissent disagrees, interpreting the government's appeal brief as arguing that an instruction on entrapment was unnecessary because Mr. Spradley had turned down a chance to back out. *Id.* at 8–9. For this interpretation, the dissent relies on several sentences pointing out that Mr. Spradley continued to message the fictitious girl after she had said she was seventeen. *Id.* Of course, the jury could consider Mr. Spradley's continued messaging in connection with an entrapment defense; no one suggests otherwise. But the dissent goes an additional step, arguing that a chance to back out—in itself—would prevent a finding of inducement irrespective of any other factors. The government never made this argument.

The dissent also relies on two parts of a motion in limine in district court. *Id.* at 9. But we focus on the parties' arguments here rather than in district court. *See Safeway Stores 46 Inc. v. WY Plaza LC*, 65 F.4th 474, 496 (10th Cir. 2023) (restricting consideration of arguments to affirm on alternative grounds to those arguments that the appellee presented on appeal rather than in district court).

Given the government's failure to argue that the chance to back out was alone fatal to an entrapment defense, "we follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). This principle counsels against "craft[ing] arguments sua sponte to affirm on alternate grounds" and reaffirms our role as neutral adjudicators of the parties' arguments. *United States v. Woodard*, 5 F.4th 1148, 1154 (10th Cir. 2021). Given our role as neutral adjudicators, we ordinarily decline to affirm on a ground sua sponte when "the parties have not had an opportunity" to brief the issue. *United States v. Chavez*, 976 F.3d 1178, 1203 n.17 (10th Cir. 2020).

Granted, we can (1) independently state the law even when the parties share a misunderstanding, *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991), and (2) affirm on alternative ground when the record is developed on a point of law, *Elkins v. Comfort*, 392 F.3d 1159, 1162 (10th Cir. 2004). So when a party presents an argument, we aren't constrained by the parties' legal theories. *See Kamen*, 500 U.S. at 99 ("When an issue or claim is properly before the court," the court can "identify and apply the proper construction of governing law."). For example, we can sua sponte

- arrive at our own interpretation of a statute even when the parties share a different understanding, *Oklahoma v. United States Dep't of Health & Hum. Servs.*, 107 F.4th 1209, 1222 n.11 (10th Cir. 2024) (stating that "we must independently interpret the [applicable] statutory phrase irrespective of the parties' positions"), *cert. granted, judgment vacated on other grounds sub nom. Oklahoma v. Dep't of Health & Hum. Servs.*,

15

No. 24-437, 2025 WL 1787685 (U.S. June 30, 2025); *WWC Holding Co. v. Sopkin*, 488 F.3d 1262, 1276 n.10 (10th Cir. 2007) ("[W]e are not limited to the parties' positions on what a statute means, because we review a question of statutory construction de novo."),

- characterize a contract as ambiguous even when the parties regard the meaning as clear, *United States v. Cortez-Nieto*, 43 F.4th 1034, 1052 (10th Cir. 2022),[5] or

- define the standard of review even when the parties share a different understanding of the standard, *United States v. Garcia*, 74 F.4th 1073, 1094 (10th Cir. 2023).

In this case, however, the dissent isn't suggesting that the parties are wrong about the law. Instead, the dissent is making a new argument that Mr. Spradley can't assert entrapment because he declined to back out when the fictitious girl said she was 17.

For new arguments, we have discretion to affirm on any ground supported by the record. *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011). But when deciding whether to exercise that discretion, we consider whether

- the alternative theory was briefed,

- the parties had an opportunity to develop the factual record, and

---

[5]    The dissent cites a minority opinion in *United States v. Hohn*, 123 F.4th 1084, 1119–30 (10th Cir. 2024) (en banc) (Bacharach, J., concurring in part & dissenting in part), *cited in* Dissent at 10. This minority opinion takes a similar approach, stating that we can take a middle ground on the burden of proof when the parties take more extreme positions. *Id.* at 1129 n.7.

16

- the question presented is one of law or fact.

*Elkins v. Comfort*, 392 F.3d 1159, 1162 (10th Cir. 2004). Here, however, the government hasn't argued that Mr. Spradley's chance to back out would alone prevent a defense of entrapment. And given the absence of such an argument, the parties haven't pointed to a record on the issue.

The government could have argued, as the dissent does, that Mr. Spradley can't assert entrapment based solely on his failure to "back out" when the fictitious girl said she was seventeen. If the government had urged affirmance on this ground, Mr. Spradley might have countered with other appellate arguments. But even without any appellate argument on the issue, the record contains testimony that Mr. Spradley didn't believe the fictitious girl when she said she was seventeen.

Mr. Spradley's skepticism is supported by his actions. Those actions did involve continued messaging, as the dissent points out. But Mr. Spradley also insisted on a photo, researched the metadata on the eventual photo, determined that it had been heavily altered, and insisted on a phone call. *See* pp. 7–10, above. From Mr. Spradley's testimony and his actions, a reasonable jury could find that Mr. Spradley hadn't believed that the fictitious girl was under 18. *Id.* And if Mr. Spradley didn't believe that he was messaging with a 17-year-old girl, as he testified, he would have had no reason to "back out" when the fictitious girl asked if her age would create a problem.

17

Of course, the jury ultimately found that Mr. Spradley had believed that the fictitious girl was 17 by the time that he drove to Kansas. By that time, however, the law-enforcement officer had sent multiple messages, which the jury could interpret as efforts to develop a rapport with Mr. Spradley and to loosen his resistance. *See* pp. 10–11, above. But the dissent's theory of a chance to back out involves Mr. Spradley's belief when the fictitious girl said she was 17—not when Mr. Spradley later made the drive to Kansas.

Even if the issue were otherwise suitable for us to consider, we would typically affirm on a new ground only if the disposition were clear. *See Griffith v. El Paso Cnty.*, 129 F.4th 790, 816 (10th Cir. 2025) (declining to affirm on an unpresented argument because the outcome would be "unclear" "at best"); *Ave. Cap. Mgmt. II, L.P. v. Schaden*, 843 F.3d 876, 886 (10th Cir. 2016) ("[E]ven for matters of law, we decline to consider newly presented legal arguments unless the proper legal disposition is beyond reasonable doubt."); *United States v. Lyons*, 510 F.3d 1225, 1238 (10th Cir. 2007) ("Our discretion allows us to determine an issue raised for the first time on appeal if it is a pure matter of law and its proper resolution is certain."). If we were to entertain the dissent's theory, its applicability here would be unclear.

Granted, we have not required an entrapment instruction when the government argued that the defendant (1) had believed that he was

18

communicating with an underage girl and (2) had turned down a chance to "back out." For example, these arguments appeared in *United States v. Robinson*, 993 F.3d 839 (10th Cir. 2021), and *United States v. Munro*, 394 F.3d 865 (10th Cir. 2005).

In *Robinson*, a law-enforcement officer posed as a 17-year-old girl. 993 F.3d at 845. But the defendant never suggested that he had questioned whether he was communicating with a 17-year-old girl. Instead, he testified only that he was "hesitant to proceed" upon learning that the girl was only 17. *Id.* We concluded that rather than back out, the defendant "caused the relationship to progress" by making plans to get a fake ID, asking the fictitious girl to delete messages, and buying her a bus ticket. *Id.* at 847.

Similarly, *Munro* involved an undercover operation with a law-enforcement officer pretending to be a 13-year-old girl. 394 F.3d at 868. When the fictitious girl said that she was just 13, the defendant asked about sex and proposed oral sex. *Id.* We concluded that the evidence was insufficient for an instruction on entrapment, pointing to the officer's testimony that he had given the defendant multiple chances to back out and he declined. *Id.* at 871–72. But the defendant didn't deny that he had believed that he was communicating with a 13-year-old girl. *See id.*

The dissent argues that *Robinson* and *Munro* show that when a defendant bypasses a chance to back out from a crime, the district court

can decline to instruct on entrapment irrespective of any other factors. Dissent at 4–5. In these cases, however, the defendants never questioned whether they were messaging with underage girls. In contrast, Mr. Spradley testified that he had

- decided from the outset that the other person wasn't who she was pretending to be,

- not believed that the person was 17 years old,

- insisted on a photo and phone call to try to determine why the person was lying, and

- researched the metadata on the photo and determined that it was heavily altered.

Nothing similar existed in *Robinson* or *Munro*; in those cases, the defendants hadn't doubted the fictitious girls' statements. *See* pp. 19–20, above.

The dissent also suggests that we should focus solely on the government's conduct and disregard Mr. Spradley's actual beliefs because the inducement test is objective. Dissent at 13–15. This suggestion assumes that a refusal to "back out" requires disregard of Mr. Spradley's skepticism about the girl's truthfulness when presented with the purported chance to back out.

We lack briefing on the issue, and our court hasn't decided whether the test for *inducement* is objective, subjective, or mixed. But two circuits have addressed the test: The D.C. Circuit says the test is objective, the

20

Ninth Circuit subjective. *Contrast United States v. Sanchez*, 88 F.3d 1243, 1249 (D.C. Cir. 1996) (objective test), *abrogated in part on other grounds by Peguero v. United States*, 526 U.S. 23, 24 (1999), *with United States v. Williams*, 547 F.3d 1187, 1197 (9th Cir. 2008) (subjective test). We not only have a circuit split but also lack any briefing on the objectivity or subjectivity of the test. Despite this lack of pertinent briefing on the issue, the dissent sides with the D.C. Circuit, treating the test as objective. Dissent at 13–15. We view it as imprudent to sua sponte decide the issue without any briefing.

Even if we were to side with the D.C. Circuit, however, it hasn't suggested that courts should disregard the defendant's actual characteristics. After all, some individuals are "particularly susceptible to inducement," which is a subjective inquiry. *United States v. McGill*, 754 F.3d 452, 459 (7th Cir. 2014). So even under an objective test, the court might consider a defendant's particular susceptibility to inducement. *Id.*[6]

---

[6]    Citing *United States v. Sanchez*, the dissent states that the objective test "look[s] at the government's behavior in relation to a hypothetical reasonable, law-abiding citizen." Dissent at 13. But *Sanchez* doesn't say that we disregard the defendant's actual characteristics or susceptibilities. *See United States v. Sanchez*, 88 F.3d 1243 (D.C. Cir. 1996), *abrogated in part on other grounds by Peguero v. United States*, 526 U.S. 23, 24 (1999). In fact, many circuits even allow expert testimony on a defendant's particular susceptibility to inducement. *E.g.*, *United States v. Nunn*, 940 F.2d 1148, 1149 (8th Cir. 1991) ("Expert testimony of a psychiatrist or psychologist is admissible to prove a defendant's unusual susceptibility to inducement."); *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655–56

21

Given the lack of input from the parties, we have little reason to reach beyond the parties' arguments. The existence of a chance to back out turns on facts involving Mr. Spradley's susceptibility to inducement, and those underlying factual questions cast uncertainty on the outcome under the dissent's approach.

We addressed similar circumstances in *United States v. Chavez*, 976 F.3d 1178 (10th Cir. 2020). There too, we considered whether to affirm a conviction on a theory that the government hadn't argued. We declined to do so, reasoning that it would be imprudent to do so. *Id.* at 1203 n.17. In declining to entertain the theory, we reasoned that it would be imprudent to "craft[] arguments for affirmance completely *sua sponte* and, more

---

(9th Cir. 2006) (stating that expert medical opinion testimony on a defendant's unusual vulnerability to inducement is admissible when adequately supported because such testimony "is highly relevant to an entrapment defense"); *United States v. Hill*, 655 F.2d 512, 516 (3d Cir. 1981) (concluding that expert testimony may be admissible on a defendant's susceptibility to inducement from subnormal intelligence or psychological characteristics), *implicitly overruled in part on other grounds as recognized by United States v. Bay*, 852 F.2d 702, 703 (3d Cir. 1988); *United States v. Newman*, 849 F.2d 156, 165 (5th Cir. 1988) ("We conclude that when an entrapment defense is raised, expert psychiatric testimony is admissible to demonstrate that a mental disease, defect or subnormal intelligence makes a defendant [particularly] susceptible to inducement.").

specifically, without the benefit of the parties' adversarial exchange." *Id.*[7]

We also addressed the issue in *United States v. Woodard*, where we again

regarded it as imprudent to affirm on a ground that the government hadn't

raised. 5 F.4th 1148, 1154 (10th Cir. 2021); *see also Safeway Stores 46*

---

[7]　　In *Chavez*, we explained:

> [T]he Dissent crafts arguments for affirmance completely *sua sponte* and, more specifically, without the benefit of the parties' adversarial exchange. As a jurisprudential matter, this is imprudent, and—under these circumstances, where we have demonstrated (with reference to the parties' arguments) that [the defendant's] conviction rests unjustly on legal error—it is troubling. "[T]he adversary system is a cornerstone of our jurisprudence." Indeed, the very notion of "judicial precedent implies that the point to the decision ... should have been argued by opposing counsel." This adversarial testing serves important ends: notably, it increases the odds that the court will "reach the 'correct' decision because the advocates will uncover and present more useful information and arguments ... than the court would develop on its own." After all, "[c]ounsel almost always know a great deal more about their cases than we do." To be sure, appellate courts have the "discretion to affirm on any ground adequately supported by the record." But ordinarily, in exercising that discretion, we have been—as a matter of basic fairness—"guided" by whether the parties have "fully briefed and argued" the alternate ground, and whether they have had "a fair opportunity to develop the factual record." These circumstances are conspicuously absent here. Accordingly, we deem the Dissent's *sua sponte* handiwork to be, again, not only imprudent, but—under these circumstances, where [the defendant's] demonstrably infirm conviction hangs in the balance—troubling. Because the parties have not had an opportunity to engage with the merits of the Dissent's arguments, neither will we.

976 F.3d at 1203 n.17 (citations omitted).

*Inc. v. WY Plaza LC*, 65 F.4th 474, 496 (10th Cir. 2023) (stating in a civil case that "we generally consider it imprudent to consider grounds for affirmance that the appellee has not argued on appeal").

Like the majorities in *Chavez* and *Woodard*, we consider it imprudent to affirm on a theory that the government hasn't raised. We can speculate about how Mr. Spradley might have countered if the government had argued that a chance to back out would alone prevent an instruction on entrapment. Even without knowing how Mr. Spradley would have countered, however, the record contains testimony that Mr. Spradley had disbelieved the fictitious girl when she said that she was 17. We thus view it as imprudent to affirm on a theory of our own device, particularly when the outcome isn't clear.

**4.    The failure to instruct on entrapment is not harmless.**

The government argues that even if the district court should have instructed the jury on entrapment, the omission would have been harmless because the evidence overwhelmingly shows a predisposition to commit the offense and little evidence of inducement. For this argument, the government simply incorporates its earlier characterization of the evidence. Mr. Spradley responds that any error would necessarily be reversible. We need not decide whether the error could be harmless: Even if the error could be harmless, the government wouldn't have satisfied its burden. *See United States v. Calzada-Maravillas*, 443 F.3d 1301, 1306

(10th Cir. 2006) (stating that the government bears the burden on harmlessness for preserved errors).

Because Mr. Spradley has presented sufficient evidence to obtain an instruction on entrapment, "proof that [he] was not entrapped effectively becomes an element of the crime." *United States v. Duran*, 133 F.3d 1324, 1331 (10th Cir. 1998). So the district court's failure to instruct on entrapment involves omission of an element. When the instructions omit an element, we've identified two standards for harmlessness. *United States v. Kahn*, 58 F.4th 1308, 1318 (10th Cir. 2023). The government didn't satisfy either standard.

First, we have asked whether the government has proven "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* (quoting *United States v. Luke-Sanchez*, 483 F.3d 703, 705 (10th Cir. 2007)). If this is the standard, the government wouldn't have satisfied its burden. Although a reasonable juror could find the crossing of a state line to pay for sex with a minor, Mr. Spradley would have avoided a conviction upon a finding of entrapment. But the district court didn't tell the jury to consider Mr. Spradley's evidence of entrapment. So the finding of guilt sheds no light on how the jury would have assessed the possibility of entrapment.

Second, we have asked whether the government has proven "beyond a reasonable doubt that the omitted element was uncontested and supported

25

by overwhelming evidence, such that the jury verdict would have been the same absent the error." *Id.* (quoting *United States v. Neder*, 527 U.S. 1, 17 (1999)). If this is the standard, the government still wouldn't have satisfied this burden. The parties disagreed over whether the government had entrapped Mr. Spradley, and we have elsewhere held that a reasonable juror could have found entrapment. *See* Part 2, above. So the evidence was contested. *See United States v. Kahn*, 58 F.4th 1308, 1319 (10th Cir. 2023) ("Where an element of an offense is contested at trial, as it was here, the Constitution requires that the issue be put before a jury—not an appellate court.").

Under either standard, the government wouldn't have satisfied its burden on harmlessness.

* * *

Mr. Spradley has also urged reversal based on errors concerning (1) the content of an instruction given after the jury announced a deadlock, (2) the introduction of testimony concerning the reason that law enforcement agents used a fictitious girl in the sting operation, and (3) the existence of cumulative error. We need not address these arguments in light of the district court's erroneous failure to instruct the jury on entrapment.

26

**5.      Mr. Spradley can be retried on remand.**

Mr. Spradley challenges not only the failure to instruct on entrapment, but also the sufficiency of evidence to convict. If the evidence were insufficient to convict, the government could not retry Mr. Spradley. *United States v. Wheeler*, 776 F.3d 736, 741 (10th Cir. 2015). So we must decide whether the evidence was sufficient. *Id.* We conclude that it was.

The district court concluded that the evidence was sufficient and denied a motion for judgment of acquittal. We conduct de novo review, considering the evidence in the light most favorable to the government. *United States v. Murphy*, 100 F.4th 1184, 1195–96 (10th Cir. 2024). With this view of the evidence, we consider whether any rational jury could have found the elements of guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Mr. Spradley argues that no rational jury could have found a motivating purpose to engage in commercial sex with someone younger than eighteen. As noted above, Mr. Spradley testified that he hadn't believed what the person was saying. *See* p. 7, above. But the jury could disbelieve Mr. Spradley's testimony about his intentions. *United States v. Magleby*, 241 F.3d 1306, 1312 (10th Cir. 2001).

First, if we view the evidence in the light most favorable to the government, the jury could reasonably find that Mr. Spradley had intended to pay for sex. For this finding, the jury could rely on Mr. Spradley's

- first message, stating that he would pay $500 "to spend the weekend trading orgasms," Supp. R. vol. 1, at 5, and

- later message stating that he would bring $500.

Mr. Spradley testified that he

- had opened with an offer to pay for sex because he didn't believe that the ad was genuine and

- had not paid for sex.

But the jury didn't have to believe Mr. Spradley's explanation. *See Magleby*, 241 F.3d at 1312.

Granted, what Mr. Spradley earlier said doesn't provide direct evidence of what he believed when he drove to Kansas. But a jury can draw logical inferences from circumstantial evidence. *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995). So Mr. Spradley's initial offer and later reference to $500 could support a logical inference that he had intended to pay the fictitious girl for sex.

Mr. Spradley also points out that when he crossed the state line, he didn't have the $500. *See* p. 6, above. But the jury could reasonably find that Mr. Spradley had planned to get cash once he met the girl.

Second, Mr. Spradley testified that he hadn't believed that he was messaging a 17-year-old girl. *See* p. 7, above. But again, the jury didn't have to believe Mr. Spradley. For example, the jury could reasonably have relied on the fictitious girl's statements that (1) she was 17 and (2) her mother had taken away access to social media.

28

Mr. Spradley argues that a jury could only speculate about Mr. Spradley's perception of the person's age. We disagree. Granted, the fictitious girl sent a photo of a female in her 30s. But we view the evidence favorably to the government at this stage. *See United States v. Roberts*, 185 F.3d 1125, 1140 (10th Cir. 1999). With this view of the evidence, a jury could logically infer Mr. Spradley's thinking from the fictitious girl's statement that she was 17 and needed her mother's permission to use social media.

The evidence was thus sufficient to convict; so Mr. Spradley can be retried on remand.

**6.    Conclusion**

Given the evidence, a reasonable jury could find that the deputy sheriff had induced Mr. Spradley to commit the offense despite his lack of a predisposition. The district court thus erred in declining to instruct the jury on entrapment. In light of that error, we vacate the conviction and remand for new proceedings. In the new proceedings, Mr. Spradley is subject to retrial[8] because the evidence was sufficient to convict.

---

[8]    The dissent states that

- our decision "may portend the end of undercover operations targeting child predators in this Circuit" and "spell[] the end of undercover operations targeting child predators in the Tenth Circuit" and

The mandate shall issue forthwith.

---

- it is unclear "how an undercover operation targeting sexual predators online could ever avoid an entrapment instruction."

Dissent at 2, 17. Respectfully, we do not share these concerns.

We're concluding only that the district court should have instructed the jury on entrapment. On remand, the district court may retry the defendant; and the new jury might reject the defense of entrapment. In any event, we've not questioned the government's ability to target child predators through undercover operations.

And if the government argues in a future case that the defendant could have backed out, we can address this issue. Our opinion here wouldn't constrain us because we're not deciding the merits of the dissent's sua sponte theory to affirm. *See Merrifield v. Bd. of Cnty. Comm'rs*, 654 F.3d 1073, 1084 (10th Cir. 2011) ("It is elementary that an opinion is not binding precedent on an issue it did not address.").

30

No. 23-3222, *United States v. Spradley*

**EID**, J., dissenting.

Steven Spradley responded to an undercover agent's online advertisement, which made no mention of sex, by offering $500 "to spend the weekend trading orgasms with [him]." Supp. R. Vol. I at 5. The undercover officer, posing as a seventeen-year-old girl named "Ashlee," replied that she was interested in Spradley's offer, but cautioned that she was underage. She even went so far as to ask Spradley whether her age posed a "problem," providing him with an opportunity to back out of any plan to have sex with a minor. *Id.* at 6. Instead of ending the conversation or withdrawing his offer to pay $500 for sex, Spradley continued communicating with Ashlee, eventually driving to a neighboring state to meet Ashlee in the hopes of having, in his words, "great sex." *Id.* at 27.

Given these facts, the district court was not required to instruct the jury on Spradley's desired entrapment defense. When, as here, an undercover agent offers a defendant an "out" that the defendant refuses to take, it can hardly be said that the government "induced" an otherwise law-abiding citizen to commit a crime. Instead, in such a circumstance, it is the defendant who makes the deliberate choice to commit the offense—not because of any government action, but because of his own predisposition. In fact, our Circuit has already recognized that the "need for an entrapment instruction" is "vitiat[ed]" when the government gives the defendant an "opportunity to back out" of the crime. *United States v. Munro*, 394 F.3d 865, 871–72 (10th Cir. 2005).

1

No. 23-3222, *United States v. Spradley*

This settled principle leads to the inevitable conclusion that the government did not entrap Spradley. But the majority concludes otherwise. Because I cannot agree with the majority's approach to determining what constitutes government "inducement"—which, I fear, may portend the end of undercover operations targeting child predators in this Circuit—I respectfully dissent.[1]

**I.**

**A.**

To explain why Spradley is not entitled to an entrapment instruction, I begin with the definition of entrapment. It is well settled that, to mount a valid entrapment defense, a defendant must show an evidentiary basis on which the jury could find (1) "government inducement of the crime," and (2) "a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. United States*, 485 U.S. 58, 62–63 (1988). "The primary distinction between these elements," we have explained, "is that inducement focuses on the government's conduct while predisposition focuses on a defendant's attitude or condition." *United States v. Young*, 954 F.2d 614, 616 (10th Cir. 1992).

---

[1] I dissent on the entrapment issue, but I agree with the majority that there was sufficient evidence to support Spradley's conviction for traveling with a motivating purpose of engaging in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b). Spradley does not dispute that the government proved beyond a reasonable doubt that he traveled in interstate commerce. And the jury heard overwhelming evidence that the entire purpose of Spradley's trip to Kansas was to engage in sex with "Ashlee"—who he was told was seventeen years old—in exchange for $500.

**No. 23-3222,** *United States v. Spradley*

Accordingly, inducement encompasses only "*government conduct* which creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense." *United States v. Ortiz*, 804 F.2d 1161, 1165 (10th Cir. 1986) (emphasis added). That inquiry is an "objective" one, "measuring whether the government's behavior was such that a law-abiding citizen's will to obey the law could have been overborne." *United States v. Kelly*, 748 F.2d 691, 697 (D.C. Cir. 1984).

But there is no risk that the government's conduct would cause a law-abiding citizen to commit a criminal offense when the government provides the potential defendant with an opportunity to withdraw from engaging in criminal conduct. An otherwise law-abiding citizen will always choose to withdraw when presented with information that their conduct, if continued, would constitute a criminal offense.

That conclusion derives both from common law and from common sense. In particular, it traces back to fundamental principles of causation. Inducement, as the Supreme Court has construed it, looks to the causal relationship between the government's conduct and the defendant's criminal act. *See Sorrells v. United States*, 287 U.S. 435, 452 (1932). When the government offers the target of an undercover operation an opportunity to back out of committing the crime, the government's actions are not the predominant cause of the crime. Rather, the crime is attributed to the defendant's own free choice. In that way, the defendant's decision to decline the chance to "back out" acts as an intervening circumstance, severing the causal link between the government's conduct and the defendant's criminal act.

3

**No. 23-3222,** *United States v. Spradley*

In light of the foregoing, our Court has repeatedly concluded that a jury instruction for entrapment is not warranted when an undercover agent offered the defendant a chance to back out of the charged crime.

For instance, in *United States v. Robinson*, 993 F.3d 839 (10th Cir. 2021), we confronted the question of whether a sting operation—remarkably similar to the one here—entrapped a defendant convicted of attempted sex trafficking of a minor in violation of 18 U.S.C. § 1591(a). There, the FBI had created a fictitious social media profile on a dating website and matched with the defendant, who was seeking to recruit prostitutes for a business venture. *Id.* at 843. After showing interest in the defendant's prostitution business, the undercover agent informed the defendant that "she was only seventeen years old." *Id.* "Despite learning" that she was a minor, the "[d]efendant caused the relationship to progress." *Id.* at 847. In fact, "[f]ar from ending things, [the] [d]efendant kept communicating with" the undercover agent, "bought her a bus ticket" to see him, and continued to send sexually explicit messages. *Id.* We held that the government did not induce the defendant "to engage in illegal conduct with a minor" because "[w]hen the government disclosed [that the fictitious girl] was underage, it provided [the] [d]efendant with an out he refused to take." *Id.* That alone, we explained, was sufficient to defeat an entrapment defense as a matter of law. *Id.*

For support, *Robinson* cited our decision in *United States v. Munro*, 394 F.3d 865 (10th Cir. 2005). In *Munro*, we held that the defendant was not entitled to an entrapment instruction because the undercover officer "gave [the defendant] more

4

**No. 23-3222,** *United States v. Spradley*

than one opportunity to back out" of meeting a minor to engage in sexual activity. *Id.* at 871. Specifically, after identifying herself as a thirteen-year-old girl and agreeing to meet to have sex, the undercover officer stated, "i don't want [to] sneak out and have this be a joke for u," and asked, "So u will be there and u not messing with me?" *Id.* at 872 n.1. The officer testified at trial that he sent these messages "to give the individual an easy way out of backing out of the chat if they are not fully intending on meeting a young child." *Id.* That, the Court explained, "vitiat[ed] the need for an entrapment instruction." *Id.* at 872–73.

The upshot of these two cases is clear: when the government either discloses information that would put the defendant on notice that his conduct, if continued, would constitute a criminal offense, or provides the defendant with a way to back out of the crime, there is no government inducement.[2] Without inducement, an entrapment defense must fail. *Robinson*, 993 F.3d at 847.

**B.**

Applying our well-settled precedent to the facts of this case, I would conclude that Spradley was not entitled to have the jury hear his entrapment defense. As in

---

[2] The First Circuit has similarly held that government conduct does not amount to inducement when an undercover officer gives the defendant an "opportunity to back away from the crime." *United States v. Vasco*, 564 F.3d 12, 19 (1st Cir. 2009); *see United States v. Cascella*, 943 F.3d 1, 8 (1st Cir. 2019). The Eleventh Circuit, meanwhile, has suggested that "[e]vidence that a defendant was afforded an opportunity to back out of a transaction and did not avail himself of that opportunity [ ] constitutes evidence of predisposition." *See United States v. Ventura*, 936 F.2d 1228, 1231 (11th Cir. 1991). Whether properly analyzed under the inducement or predisposition prong, the result is the same: a defendant who fails to take advantage of a chance to back out of the crime cannot establish entrapment.

5

**No. 23-3222,** *United States v. Spradley*

*Robinson* and *Munro*, the government could not have induced Spradley because it provided Spradley with an out—an out that Spradley refused to take.

Within the first few messages of their conversation, after discussing Spradley's money-for-sex offer, the undercover agent informed Spradley that "Ashlee" was seventeen. Not only did the officer disclose that she was a minor, but the officer also specifically asked Spradley if that posed a problem, indicating that their arrangement was wrongful.[3] Supplied with the requisite information to know that his conduct, if continued, would be unlawful—yet with a readily available escape hatch—Spradley forged ahead. Without any reservation, he continued to communicate with Ashlee, confirming his plan to have sex with her in exchange for $500 and eventually offering to drive across state lines to pick her up to facilitate their meeting. And he continued to share intimate and sexually explicit messages with her until the day he was arrested after driving from Kansas City to Topeka to meet her. Thus, all of Spradley's conduct following Ashlee's disclosure that she was a minor indicates that he declined the government's offer to back out of the crime.

---

[3] Despite the majority's suggestion that Spradley faced no criminal liability until the government persuaded him to drive across the Kansas border, *see* Maj. Op. at 12, knowingly "[h]iring a person younger than 18 years of age by . . . offering . . . anything of value to any person, to engage in . . . sexual intercourse" constitutes commercial sexual exploitation of a child under Kansas law. Kan. Stat. Ann. § 21-6422(a)(1). Consequently, when Spradley declined the government's out, he committed a felony, even if he was not ultimately charged with that crime in state court. Had he accepted the government's offer to back out, he would not have continued to commit the crimes he did, including the federal crime he was convicted of here. In that way, the government's conduct did not induce an otherwise law-abiding citizen to commit *any* crimes—much less the crime of traveling with the purpose of engaging in commercial sex with a minor.

6

**No. 23-3222,** *United States v. Spradley*

In fact, the government's case here is even stronger than in *Robinson* and *Munro*, because the undercover agent went beyond merely disclosing Ashlee's age and explicitly asked Spradley whether that fact posed a problem. The officer's question not only put Spradley on notice that their arrangement was unlawful, but it also provided Spradley with a clear opportunity to back out of the crime.

The government's conduct, therefore, could not and did not create "a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense." *Ortiz*, 804 F.2d at 1165. Any law-abiding citizen would have ended the conversation or withdrawn the offer to pay for sex the moment he learned that he was communicating with a minor. Any law-abiding citizen certainly would not have continued to send sexually explicit messages[4] and would not have driven over sixty miles across state lines to have sex with a minor in exchange for money. Thus, the government's conduct did not induce Spradley to travel with the purpose of engaging in commercial sex with a minor.

## C.

The majority does little to rebut this unavoidable conclusion. Instead, the majority resorts to the party presentation principle to skirt the issue, simultaneously

---

[4] The majority suggests that much of the conversation about the money-for-sex scheme was a joke because Spradley included internet slang at the end of his messages. Maj. Op. at 6. But including common slang like "laugh out loud" or "lawlz" at the end of a message, even when viewed in the light most favorable to the defendant, does not automatically turn a serious message into a joke, shielding the participants from criminal liability.

No. 23-3222, *United States v. Spradley*

misapplying it here and drastically overstating its applicability in the process. And what little the majority does say about the government-provided "out" demonstrates that the majority fundamentally misunderstands the inquiry under the inducement prong.

**1.**

The majority refuses to apply these principles of inducement in part because it claims that the government never advanced the argument that the undercover agent provided an "out" to Spradley, which in turn negated inducement. But a quick look at the government's brief on appeal belies the majority's claim. In a nutshell, here's what the government argued: the "exchanges" between Spradley and the undercover agent demonstrate that the government's conduct "did not create a substantial risk that an undisposed person would agree to cross state lines in order to purchase sex from a minor." Aple. Br. at 34–35. Those exchanges included telling Spradley "that [Ashlee] was 17 years old and ask[ing] [him] if that was a problem." *Id.* at 35. And the government pointed out that Spradley "voiced no objection" when he learned "Ashlee was 17 years old," instead deciding to continue their sexually explicit conversation and make plans to have sex in exchange for money. *Id.* The government concluded its argument on the inducement prong by stating the following:

> These exchanges make clear that Ashlee did not induce Defendant to offer to pay her money for sex through persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship. On the contrary, Defendant proposed

8

**No. 23-3222,** *United States v. Spradley*

the crime and stated that he was eager to carry it out *even after Ashlee told him she was 17 years old*.

*Id.* at 35–36 (emphasis added).

That latter point echoed what the government stated below when it argued that there was no inducement because Spradley "had multiple opportunities to withdraw from the conversation but did not." R. Vol. I at 156. Thus, although the government did not attach a label to its argument or use the phrase "back out," it argued in substance that the agent's disclosure of Ashlee's age and Spradley's decision to forge ahead defeated inducement. In my view, that is the only plausible way to understand the government's position.

The majority seemingly takes issue with the government's failure to expressly characterize the undercover agent's disclosure of Ashlee's age as an opportunity to "back out" of committing the crime. But we have never required litigants to use magic words to identify their legal theories, nor have we placed any special importance on a party's characterization of its own argument. The substance of the argument is all that matters. And here, the government's argument was, in essence, that it did not induce Spradley because it disclosed Ashlee's age and asked if her underage status posed a problem, thereby providing "multiple opportunities to withdraw from the conversation." R. Vol. I at 156. The majority's contention that I am crafting a "new" argument for the government is baffling, to say the least.

Even assuming the government had not advanced this precise theory, the party presentation principle would not prevent our Court from applying the principles

9

**No. 23-3222,** *United States v. Spradley*

discussed above to this case.  I agree with the majority that federal courts generally

"rely on the parties to frame the issues for decision."  *Greenlaw v. United States*, 554

U.S. 237, 244 (2008).  However, once "an issue or claim is properly before the court,

the court is not limited to the particular legal theories advanced by the parties, but

rather retains the independent power to identify and apply the proper construction of

governing law."  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991); *United*

*States v. Hohn*, 123 F.4th 1084, 1129 n.7 (10th Cir. 2024) (en banc) (Bacharach, J.,

dissenting in part) (quoting the same).  Relying on this language, we have previously

explained that the party presentation principle seeks to prevent our Court from

"raising new issues."  *United States v. Cortez-Nieto*, 43 F.4th 1034, 1052 (10th Cir.

2022).  But "once a party raises an issue, we are not required to 'render [our]

decision in accordance with the position of one of the parties.'"  *Baca v. Cosper*, 128

F.4th 1319, 1327 n.5 (10th Cir. 2025) (alteration in original) (quoting *Cortez-Nieto*,

43 F.4th at 1052).

Here, whether the government induced Spradley to commit the offense is not a

"new" issue.  Both parties raised and extensively briefed the issue.  *See* Aplt. Br. at

46–49; Aple. Br. at 33–36.  My view as to why no government inducement occurred

here—that is, because the government offered Spradley an opportunity to back out of

committing the crime—is therefore only an application of governing law within the

already-presented issue of inducement.  In that way, my position does not run afoul

of the party presentation principle.  Simply put, the party presentation principle is not

even implicated.

10

**No. 23-3222,** *United States v. Spradley*

Instead, my position—even ignoring the fact that the government did advance it—would conform with the longstanding principle that "we may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented to us on appeal." *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011) (Gorsuch, J.). As we have cogently explained, the power to affirm on alternate grounds is not just a power but a duty:

> This broad power to affirm extends beyond the counter-arguments raised by the appellee; it includes any ground for which there is record to support conclusions of law. Once the appellant alleges the district court erred, we have a duty to assess the validity of the appellant's allegations. This duty arises in part out of our relationship with the district court, and we may not neglect it simply because an appellee fails to defend adequately the district court's decision. To do so would open the door to a perverse jurisprudence by which properly decided district court decisions could be reversed.

*Hernandez v. Starbuck*, 69 F.3d 1089, 1093–94 (10th Cir. 1995). Therefore, contrary to the majority's view, a party's argument—or lack thereof—does not require our Court to "sacrifice the integrity of our jurisprudence" at the expense of adhering to the "party presentation principle." *Short v. Hartman*, 87 F.4th 593, 604 (4th Cir. 2023).

The majority brushes all this aside, suggesting that I am making a factual argument—one inappropriate for us to consider sua sponte. But that entirely misstates my position. I am not embroiling the Court in a factual dispute about whether the government provided Spradley with an "out"; to the contrary, I am merely concluding—based on the undisputed facts in the record—that the government's conduct does not amount to inducement as a matter of law. We have

11

routinely concluded that whether the government's conduct amounted to inducement is a question of law, not one of fact. *See, e.g.*, *United Sates v. Vincent*, 611 F.3d 1246, 1249–50 (10th Cir. 2010) ("Whether there is evidence sufficient to constitute a triable issue of entrapment is a question of law." (cleaned up)); *see also Sherman v. United States*, 356 U.S. 369, 372 (1958) (concluding that "entrapment was established as a matter of law" based on the record).

In this case, it is uncontroverted that the government provided an out which Spradley refused to take. In fact, Spradley, in his opening brief, admits that Ashlee sent him a message saying, "Im 17 is that a problem?" Aplt. Br. at 6. He further admits that, notwithstanding Ashlee's disclosure, he did not end the conversation or withdraw his offer to have sex in exchange for money. *Id.* at 7. Consequently, there is no dispute that the undercover agent disclosed Ashlee's age, asked if her age posed a problem, and with that information in mind, Spradley did not end the conversation. Based on those facts alone, I would conclude that Spradley is not entitled to an entrapment decision as a matter of law. That is not a factual conclusion—it is a legal one based on the evidence in the fully developed record. The majority's reliance on the party presentation principle is thus unavailing.

## 2.

After erroneously suggesting that my position is barred by the party presentation principle, the majority attempts to distinguish this case from our line of cases refusing to require an entrapment instruction when the government provided a chance to "back out." Maj. Op. at 18–20. Relying primarily on Spradley's own

12

**No. 23-3222,** *United States v. Spradley*

testimony that he did not believe the person he was communicating with was under

eighteen, the majority claims that Spradley had no reason to "back out." Thus, as the

majority sees things, the government did not give Spradley a legitimate opportunity

to back out of committing the crime because Spradley refused to believe Ashlee's

warning that she was seventeen.

There are two critical problems with this argument. First, the majority

misunderstands the inducement analysis, focusing not on the government's conduct

but rather on the defendant's subjective state of mind. As the name suggests, the

proper focus of government inducement is on the *government's* conduct. *Young*, 954

F.2d at 616. Correctly understood, the inducement inquiry assesses whether the

government's conduct was so coercive or overly persuasive that it "creates a

substantial risk that an undisposed person or otherwise law-abiding citizen would

commit the offense." *Ortiz*, 804 F.2d at 1165; *see also* Paul Marcus, *The Entrapment*

*Defense* § 5.09 (5th ed. 2016) ("The crucial proof question can be stated succinctly:

When does the government involvement constitute such overreaching that the

defendant should be freed from criminal responsibility?"). That inquiry, as noted

above, is an "objective" one, looking at the government's behavior in relation to a

hypothetical reasonable, law-abiding citizen. *See United States v. Sanchez*, 88 F.3d

1243, 1249 (D.C. Cir. 1996). The defendant's subjective state of mind, therefore, is

irrelevant in determining whether the government's conduct amounted to

13

inducement.[5]  How a particular defendant responded, or what the defendant believed to be true, cannot factor into whether the government's conduct was overreaching in the first place.

True, a defendant needs to have notice of the government-provided "out" in order to negate inducement, but that does not change the nature of the inquiry—it remains an objective one.  Here, the undercover agent, upon receiving Spradley's offer to have sex in exchange for money, warned Spradley that "Ashlee" was seventeen and asked if Spradley was fine with having sex with a minor.  Any reasonable, law-abiding citizen would be on notice that the transaction was illicit and would know that there was an easy way to back out by simply saying no.  Thus, even

---

[5] While the majority rightly notes that assessing inducement can sometimes involve considering the defendant's characteristics or susceptibilities, it overlooks that such characteristics and susceptibilities are relevant to inducement only if the government knows and takes advantage of those attributes to cause a defendant to commit a crime.  Without such knowledge, it would be illogical to conclude that the government's conduct was overreaching because of a defendant's particular susceptibility.  Consequently, even when the defendant's individual characteristics are relevant, the inducement analysis remains focused on the government's conduct with respect to what the government knew or should have known about the defendant—not on the defendant's subjective beliefs.  *See United States v. Montoya*, 844 F.3d 63, 67–68 (1st Cir. 2016) (explaining that the government's knowledge of the defendant's characteristics, such as the defendant's drug addition, can factor into the inducement inquiry if "the government cooperator used [the defendant's] addiction either to engender sympathy or to create a sense of urgency").

Here, the record does not show that the government knew about some susceptibility or characteristic and took advantage of it.  Rather, the undercover agent had no reason to know Spradley was skeptical that Ashlee was underage.  In that way, Spradley's belief about Ashlee's age is irrelevant in determining whether the government's conduct was overreaching.

No. 23-3222, *United States v. Spradley*

if Spradley himself failed to appreciate the opportunity to back out of the crime, that subjective belief does not matter.

The second flaw with the majority's argument is that it conflicts with the jury's explicit findings.  The majority concludes that, based on Spradley's "testimony and [ ] actions, a reasonable jury could find that Mr. Spradley hadn't believed that the fictional girl was under 18."  Maj. Op. at 17.  But *this* jury found the exact opposite.  To find Spradley guilty of violating 18 U.S.C. § 2423(b), the jury had to find "beyond a reasonable doubt that Mr. Spradley believed the victim to be an actual minor person."  R. Vol. I at 330.  Therefore, by convicting Spradley, the jury necessarily rejected the contention that Spradley believed Ashlee was over eighteen.

And nothing in the record—beyond Spradley's self-serving testimony[6]—suggests that Spradley believed Ashlee was lying about her age when she offered him an out.  The majority points to the fact that the undercover agent sent "multiple messages" to Spradley following their initial interaction, "loosen[ing] his resistance" and leading him to believe she was telling the truth about being underage.  Maj. Op. at 18.  But these subsequent messages had the opposite effect—as Spradley himself argued.  Reply Br. at 3 (arguing that Spradley did not believe Ashlee was seventeen in part because of the "obviously highly filtered photo that Ashlee sent to Spradley").  In other words, when the undercover agent sent a photo of a thirty-year-old woman

---

[6] As we have made clear, "conclusory and self-serving statements" by themselves are not enough "to establish a triable issue" for an entrapment defense. *Ortiz*, 804 F.2d at 1165–66.

15

**No. 23-3222,** *United States v. Spradley*

and demonstrated detailed knowledge of sexual concepts, it made it more likely—not less—that Spradley would have believed Ashlee was lying about being seventeen. Thus, if anything, Spradley would only have had reason to doubt Ashlee's age *after* their conversations progressed. But, as explained, the jury explicitly rejected that conclusion, too. It naturally follows that, by concluding Spradley did not doubt Ashlee's age even after he had reason to do so, the jury likewise would have concluded that Spradley did not doubt Ashlee's age when she first disclosed it— *before* his suspicion allegedly formed.

Therefore, even if the evidence created a triable issue on inducement under the majority's theory, the district court's refusal to give an entrapment instruction was harmless. The jury determined that Spradley believed Ashlee was seventeen when he traveled to Kansas and nothing in the record indicates that the jury would come to the opposite conclusion when Ashlee initially disclosed that she was seventeen. In fact, the record demonstrates that by the time Spradley traveled to Kansas he had more reason to question Ashlee's statement that she was underage than during their initial conversation. I therefore fail to see how the error identified by the majority—to the extent it is an error at all—warrants reversal.

## D.

The majority's response does not change what has always been the law in our Circuit: when the government attempts to dissuade the defendant from committing a crime by providing him with an opportunity to withdraw, it is not the government's conduct that caused the commission of the offense. Instead, the defendant only has

16

**No. 23-3222,** *United States v. Spradley*

his own choices to blame for his criminal acts. The majority fails to apply this well-established concept to Spradley's case and, consequently, reaches the wrong result.[7]

In the end, I worry that today's decision spells the end of undercover operations targeting child predators in the Tenth Circuit. The majority holds that the government's conduct—which included posting a lawful advertisement, accepting the defendant's sexual offer, discussing supposed intimate details such as food, movies, and their middle names, and asking Spradley to "swing by"—went too far. That is so, the majority concludes, even though the government offered the defendant an opportunity to back out of the crime and indicated to the defendant that his conduct was wrongful.

If that can constitute entrapment, I do not know how an undercover operation targeting sexual predators online could ever avoid an entrapment instruction. With such an expansive definition of entrapment, law enforcement might well choose to refrain from these undercover operations out of fear of losing a conviction to entrapment and thereby wasting their limited resources. As a result, there might now be more child predators on our streets (and on our websites) able to harm children before getting caught. Today's decision, however, does not change the fact that the government is entitled to "use [ ] deceit," particularly when it "is the only practicable

---

[7] Because the majority reverses Spradley's conviction for failing to instruct the jury on entrapment, it does not address Spradley's other grounds for reversal. I would instead address Spradley's remaining arguments concerning (1) the *Allen* instruction, (2) the admission of certain testimony, and (3) the existence of cumulative error, and I would ultimately affirm Spradley's conviction.

17

**No. 23-3222,** *United States v. Spradley*

law enforcement technique available." *United States v. Russell*, 411 U.S. 423, 432

(1973).  Catching sexual predators before they harm children, I believe, is one of

those circumstances.

## II.

For these reasons, I respectfully dissent.